IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CARROL JOE DRISKELL, #145957 ,     )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )      CASE NO. 2:11-cv-721-WKW
                                   )            [WO]
                                   )
KENNETH JONES, et al.              )
                                   )
        Defendants.                )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This case is before the court on a 42 U.S.C. § 1983 complaint filed by Carroll Joe

Driskell. At the time of the events described in the amended complaint, Driskell was serving

a ninety-nine-year sentence in Bullock Correctional Facility for rape in the first degree.[1]

(Doc. 29 p. 4).  On June 21, 2011, after being found with a map of the prison and escape

plans, Driskell was placed into a disciplinary segregation unit and, subsequently, was

classified as a security risk to the prison.  (Doc. 29 p. 12).  Driskell challenges his

consecutive assignment to disciplinary segregation for various rule infractions, the

institutional decision to confine him in administrative segregation rather than transfer him

to another facility following his completion of disciplinary segregation, and the

constitutionality of various conditions of his confinement in the administrative segregation

---

[1] On March 23, 2012, Driskell was transferred to Donaldson Correctional Facility.  (Doc. 56).

unit. (Doc. 6). Driskell names Warden Kenneth Jones, Warden Renee Mason, Captain Sylvester Nettles, Laundry Supervisor Telease Ellison, and Chief Steward Fedrick McClain as Defendants. (Doc. 6; Doc. 13 p. 1). Driskell seeks a declaratory judgment, injunctive relief, and monetary damages for the alleged violations of his constitutional rights.

The Defendants have filed answers, a report and supplemental report, and relevant supporting evidentiary materials, including affidavits and disciplinary reports, addressing Driskell's claims for relief. (Doc. 13; Doc. 42). The court informed Driskell that the Defendants' special report may, at a future time, be treated as a motion for summary judgment and explained to Driskell the proper manner in which to respond to a motion for summary judgment. (Doc. 14). Driskell responded to the report and to the supplemental report. (Doc. 29; Doc. 48). Pursuant to that order, the court deems it appropriate to treat the Defendants' report as a motion for summary judgment. Thus, this case is now pending on the Defendants' motion for summary judgment. Upon consideration of this motion and the evidentiary materials filed in support thereof, the court concludes that the Defendants' motion for summary judgment is due to be granted.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir.

2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*. "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to survive the Defendants' properly supported motion for summary judgment, Driskell is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. 242).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and,

therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the Defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the

substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine dispute of material fact, nonmoving party must produce evidence such that reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the

6

nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Driskell fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

### III.  Relevant Facts

Since February 20, 1987, Driskell has been serving a ninety-nine-year sentence in Alabama state prisons for rape in the first degree. (Doc. 29 p. 4; Doc. 13-8 p. 1). He is currently housed at Donaldson Correctional Facility, but, at all times relevant to his complaint, he was housed at Bullock Correctional Facility.

On June 2, 2011, Officer Marvin Pitts was roving Driskells' dormitory and waking up the inmates to go to the yard. (Doc. 42-1 p. 4; Doc. 42-1 p. 19). When Pitts approached Driskell, Driskell presented papers showing that, for medical reasons, he was not to be subject to prolonged standing or walking. *Id*. Officer Pitts instructed Driskell that he was required to attend yard call but that he was allowed to sit down while attending. *Id*. Driskell responded: "Where the fuck do you want me to go man?" *Id*. Officer Pitts ordered Driskell to stop cursing and go to the yard. *Id*. Driskell replied: "Write it up then, cause I'm not going to the yard." *Id*. Officer Pitts informed Driskell that he would be written up for violating rule

#56, Failure to Obey A Direct Order of A DOC Official and rule #57, Insubordination.  *Id*.

Driskell responded: "I don't give a fuck. I got twenty-five years in this shit."  *Id*.  Officer

Pitts notified Lt. Rebecca Bonner of the situation, and  Driskell complied with Lt. Bonner's

subsequent instructions to report to the yard.  *Id*.

On June 10th, 2011, Driskell was served with two disciplinary reports each citing him

for a separate rule violation committed during the June 2 incident and notifying him that he

would be required to attend a disciplinary hearing related to those violations.  (Doc. 42-1 p.

18).

On June 10th, 2011, Driskell wrote the following letter addressed to Ms. C. Downing,

Classification Officer at Bullock Correctional Facility:

> Would you please put me in for an "increase" in custody.  I want to go back to
> a max. prison Donaldson, Holman, St. Clair period!
>
> I do not care what it takes please get me back to a max prison.  I've got 2
> disciplinaries on 6-10-11!!  Parole is dead!!
>
> I keep asking, no-one wants to help - listen or do!
>
> I do not want to stay at any Level IV period.  To force me to stay at these
> Level IV prisons is to force me into a whole another mode.  I am not adjusting
> nor can I handle.  I am not talking about waiting until my annual.  Call and
> speak to me - but please get me back to a max prison ASAP!!!

(Doc. 42-1 p. 12) (sic).

On June 13th, 2011, Driskell received the following response to his letter demanding

transfer to another prison: "Review due in 10/2011 however you do have a medical hold that

will hold you up."  (Doc. 41-2 p.2).

8

On June 21, 2011, Driskell was discovered to be in possession of a crudely-drawn map of the prison and several sheets of paper upon which Driskell had scrawled notes of his escape plans such as "stay off the main road - find car or truck - hotwire." (Doc. 42-1 pp. 1, 5). Driskell's June 10th, 2011, letter demanding an increase in custody level and transfer to a maximum security prison were found and reviewed along with his escape plans. *Id*. When questioned about his escape plans, Driskell stated that it wouldn't be hard to escape; that during medical transports the officers were not paying attention and were talking on cellular phones; that he walked up behind an officer while on medical transport and could have taken the officers' weapon; that he could have taken any female in the institution hostage at any time; and that it would be easy to escape from the backgate because the officer stationed there was sitting in front of a computer so that "[a]ll you have to do is come up behind him and put a knife to his throat." (Doc. 42-1 p. 5). Driskell further stated that the only reason he had not yet attempted to escape was because of his hernia. *Id*. Driskell was then escorted to the segregation unit within the prison to await a disciplinary hearing. *Id*.

On June 26th, 2011, a disciplinary hearing was held regarding charges stemming from the June 2, 2011, incident when Driskell cursed at Officer Pitts and refused to go to the yard. (Doc. 42-1 p. 20, 26). He was found guilty of insubordination for saying to Officer Pitts, "where the fuck do you want me to go, man," for which he received the following punishment: "30 days loss of store, visitation, telephone, and confine to segregation for 10 days, all to run consecutively." (Doc. 42-1 p. 20, 27). Driskell was given a second

additional, identical punishment "to run consecutively" after also being found guilty of refusing to follow a direct order when he refused to go to the yard and stated "I am not going to the yard write me up." (Doc. 42-1 pp. 29-30).

On June 28, 2011, Driskell was served with a disciplinary notice for his possession of an escape plan. (Doc. 42-1 p. 13). At a June 29, 2011, hearing, Driskell admitted his guilt. (Doc. 42-1 p. 14). He was then found guilty of intentionally creating a security, safety, or health hazard, for which he received the following punishment: 60 days' loss of store privileges, visiting privileges, and telephone privileges, extra duty for 60 days, and confinement to segregation for 45 days "to run consecutively." (Doc. 42-1 p. 17). In addition, the hearing officer recommended that Driskell's custody classification be reviewed. *Id*.

Subsequently, Driskell's security classification was increased from 4 to 5. (Doc. 42-1 p. 2). After Driskell completed the time in the segregation unit mandated by his punishments for various rule violations, he continued to be administratively housed in the segregation unit not as a disciplinary punishment, but due to his security classification and the fact that he posed a threat to the security of the institution. (Doc. 42-1 p. 2; Doc. 6 p. 9; Doc. 29 p. 12).

Driskell contends that the prison violated due process and its own administrative regulations by requiring him to serve his disciplinary punishments for each rule violation consecutively. Driskell also contends that the prison's decision to continue to confine him in administrative segregation unit rather than immediately transfer him to a maximum

10

security prison following his completion of time assigned to disciplinary segregation constitutes a violation of equal protection and due process and unconstitutional retaliation for possession of escape plans.  In addition, Driskell also contends that various conditions of his confinement in the Bullock Correctional Facility administrative segregation unit violate the Eighth Amendment's protection against cruel and unusual punishment.

## IV.  DISCUSSION

### A.  Absolute Immunity

With respect to any claims Driskell lodges against the Defendants in their official capacities, they are entitled to absolute immunity from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  A state official may not be sued in his or her official capacity unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Dellmuth v. Muth*, 491 U.S. 223, 227 (1989).  "Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).  Therefore, Alabama state officials are absolutely immune from claims for monetary damages brought against them in their official capacities.  *Id.*

Thus, the Defendants are state actors entitled to sovereign immunity under the

Eleventh Amendment and are absolutely immune from claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## B.   Injunctive and Declaratory Relief

Unlike claims for monetary relief, claims for injunctive and declaratory relief are prospective in nature, and are intended to prevent future injuries. *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007), abrogated on other grounds by *Sossamon v. Texas*, 131 S.Ct. 1651 (2011); *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997). "When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury." *Adler*, 112 F.3d at 1477. Accordingly, absent class certification, the general rule in this circuit is that a transfer or a release of the named plaintiff from one prison to another will moot that plaintiff's claims for injunctive and declaratory relief from conditions at the first prison. *Smith*, 512 F.3d at 1267; *McKinnon v. Talladega County, Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984); *Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986).

Since the filing of his complaint, Driskell has been transferred to Donaldson Correctional Facility and no longer resides in the Bullock Correctional Facility administrative segregation unit. (Doc. 56). Particularly in light of Driskell's repeated requests to prison officials and to this court for relief in the form of a transfer to another prison, there is no

basis for finding that Driskell was transferred as a subterfuge to deprive this court of jurisdiction to determine the merits of Driskell's claims. *See McKinnon*, 745 F.2d at 1360 (holding that jurisdiction "might" be entertained over a prisoner's claims for injunctive relief "if there were evidence" that a prison transfer was an "effort[] on the part of the defendants to evade the jurisdiction of the court").

Further, it does not appear that Driskell is remotely likely to be assigned again to administrative segregation unit in the Bullock Correctional Facility. (*See* Doc. 70). *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ("[T]he capable-of-repetition" exception to the mootness doctrine "applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality."). Moreover, there is no indication that the challenged policy regarding reading material in the administrative segregation unit is a system-wide policy that also applies at Donaldson or that Driskell is likely to be placed on administrative segregation at Donaldson Correctional Facility. *Cf. Smith*, 502 F.3d at 1267 (holding that reincarceration within the ADOC prison system during the pendency of a lawsuit revived a prisoner's earlier claim challenging an ADOC ruling that he could not possess a religious crystal). In any event, injunctive relief against the Defendants, who are officials of Bullock Correctional Facility, could not remedy any allegedly unconstitutional condition at Donaldson. *See Boxer X v. Donald*, 169 Fed. Appx. 555, 559 (11th Cir. 2006) ("Because Boxer is no longer housed at the prison in which defendants Flynn and Terry are currently employed, [claims for]

13

injunctions against [Flynn and Terry] are now moot.").

In sum, Driskell has no longer has any legally cognizable interest in any potential prospective injunctive relief granted against the Defendants regarding the procedures or conditions at the Bullock Correctional Facility administrative segregation unit.  Therefore, Driskell's claims for injunctive and declaratory relief regarding policies and conditions in the Bullock Correctional Facility administrative segregation unit are moot.  *Smith*, 502 F.3d at 1267 ("[O]nce the prisoner has been released, the court lacks the ability to grant injunctive relief and correct the conditions of which the prisoner complained"); *see also Mann v. McNeil*, 360 Fed. Appx. 31 (11th Cir. 2010) (holding that a prisoner's claim for injunctive relief in the form of a prison transfer was moot because he already received a transfer); *Hathcock v. Cohen*, 287 Fed. Appx. 793 (11th Cir. 2008) (holding that a prisoner's claims for injunctive relief from allegedly unlawful prison policies were moot when he was transferred from the custody of the prison where those policies were enforced); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (holding that, when a prisoner was transferred from a segregation unit at one prison to another prison, his request for injunctive relief against officials regarding rules and conditions in the segregation unit at the first prison was moot because he could not demonstrate that he was likely to be retransferred).

## C.    Due Process and Consecutive Confinement in Disciplinary Segregation

Driskell contends that his right to due process has been violated because, allegedly in violation of Administrative Regulation # 403, he was required to consecutively serve his time

14

in disciplinary segregation for each rule violation.  (Doc. 6 pp. 7-9).

The punishment of prisoners in disciplinary segregation is precisely the sort of day-to-day prison management decision for which prison officials must be afforded deference by the courts. *Sandin v. Conner*, 515 U.S. 472, 482, 485 (1995). Moreover, an allegation of prison officials' non-compliance with a prison regulation by is not, in itself, sufficient to give rise to a claim under § 1983 upon which relief may be granted. *See id*. at 481–82 (noting that many prison regulations "are primarily designed to guide correctional officers in the administration of a prison" and that "such regulations are not designed to confer [constitutional] rights on inmates"). While mindful of the deference that must be afforded to prison officials in administration of prison discipline, the court has reviewed Administrative Regulation # 403.  (Doc. 13-1 p. 7).  Rule # 403 provides that an inmate charged with "a violation of departmental administrative regulations" "can be placed in disciplinary segregation for up to 45 days." (Doc. 13-1 p. 7).  At no time was Driskell placed in disciplinary segregation for more than 45 days for "a violation" of administrative regulations. Rather, he spent more than 45 consecutive days in disciplinary segregation because he incurred *multiple* violations, and he spent 45 days or less in disciplinary segregation for each violation.   Nothing in Rule # 403 prohibits separate punishments in disciplinary segregation incurred by multiple rule violations from being served consecutively.  Therefore, Driskell's argument that his punishment violates internal prison rules is utterly without merit from the start because his punishment did not violate Rule # 403.

In any event, however, the touchstone of whether the State of Alabama has created a due process interest that might be violated by Driskell's consecutively-served time in disciplinary segregation is not whether the particular language of Rule # 403 "created an enforceable expectation that the State would produce a particular outcome with respect to [Driskell's] conditions of confinement." *Sandin*, 515 U.S. at 481. Rather, the due process inquiry turns on whether consecutive confinement to disciplinary segregation "imposes atypical and significant hardship on [Driskell] in relation to the ordinary incidents of prison life." *Id.* at 484. In this case, Driskell's consecutive confinement in disciplinary segregation, "with insignificant exceptions, mirror[s] those conditions imposed on inmates in administrative segregation," *id.* at 486, including his own continuing confinement in administrative segregation as he himself describes it (*e.g.*, Doc. 29 pp. 12-15). Accordingly, Driskell's consecutive disciplinary placement in the segregation unit "d[oes] not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest" that implicates due process concerns. *Sandlin*, 515 U.S. at 486.

Moreover, Driskell has no independent federally-protected due process interest in being assigned a particular security classification or in being transferred out of the administrative segregation unit. *Hewitt v. Helms*, 459 U.S. 460, 473 (1983), overruled on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995); *Meachum v. Fano*, 427 U.S. 215 (1976); *Kramer v. Donald*, 286 Fed. Appx. 674, 676 (11th Cir. 2008).

Therefore, Driskell's consecutive confinement in disciplinary segregation cannot

16

form the basis for a § 1983 claim for deprivation of due process rights.  *See Sandin*, 515 U.S. 472.

### D.   Delayed Prison Transfer: Equal Protection And Due Process

Driskell argues that all other prisoners designated as security risks were "transferred very quickly" to maximum security prisons after completing their time in disciplinary segregation, but he was not transferred to a maximum security prison until March 23, 2012. (Doc. 6 p. 10; Doc. 56).   Driskell claims that he, too, should have been "immediately" transferred to a maximum security prison after completing his time in disciplinary segregation (although, notably, he does not contend that he had a right to be transferred to the general population or any other unit *within* Bullock Correctional Facility).   It appears that Driskell is attempting to claim that his continued administrative confinement in the segregation unit constituted a violation of his right to due process and the constitutional guarantee of equal protection (Doc. 6 pp. 9-10).

To prevail on an equal protection claim, a prisoner must establish that he was treated differently than similarly-situated prisoners, and that the differential treatment was the result of invidious discrimination against him based on race, religion, national origin, or some other constitutionally-protected interest. *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986).   Driskell identifies no constitutionally-protected basis for the allegedly differential treatment between himself and other inmates who have been transferred to other prisons, and the record does not support a finding that he was held in administrative

segregation due to unconstitutional discrimination of any kind.  *Cf. Sweet v. Sec'y Dep't of Corr.*, 467 F.3d 1311, 1319 (11th Cir. 2006) ("[The plaintiff's] equal protection claim fails because he has not alleged, let alone established, that he was treated differently on account of some form of invidious discrimination tied to a constitutionally protected interest. He has not even claimed that he was treated differently from others because of race, religion, or national origin.").

Clearly, Driskell feels that his continued relegation to administrative segregation was arbitrary, but arbitrary decisions made without an intent to discriminate are not violative of the equal protection clause.  *E & T Realty v. Strickland*, 830 F.2d 1107, 1113-14 (11th Cir. 1987).  Despite Driskell's bare assertion that he was held in administrative segregation for no valid reason, the uncontradicted evidence establishes that Driskell is being held in administrative segregation due to his security classification and because of "his behavior and the threat he poses."  (Doc. 42-1 p. 2).  Although Driskell claims that other prisoners who have been classified as security risks for gang fighting and other infractions have been transferred to maximum security facilities, he has not identified any other inmate whose behavior was similar to his own or who posed a similar threat to the security of the institution.  None of the other prisoners identified by Driskell as having been transferred were found in possession of a map and escape plan or confessed to entertaining plans for several methods of escape that posed threats to the lives and security of prison personnel. *Sweet*, 467 F.3d at 1319 ("[The plaintiff's equal protection claim necessarily fails . . . because

18

he has not shown that he was treated differently from other, similarly situated prisoners.").

Accordingly, Driskell has not presented any evidence that he has been treated differently than any similarly-situated prisoner or that any alleged differential treatment was due to unconstitutional discrimination, and his equal protection claim cannot survive summary judgment. *See Sweet*, 467 F.3d at 1319.

Moreover, Driskell has no independent federal or state-created due process interest in being assigned a particular security classification or in being transferred out of the administrative segregation unit to a maximum security state prison. *Sandin v. Conner*, 515 U.S. 472 (1995); *Meachum v. Fano*, 427 U.S. 215 (1976); *Kramer v. Donald*, 286 Fed. Appx. 674, 676 (11th Cir. 2008).

Accordingly, Driskell cannot prevail on a due process or equal protection claim regarding the time during which he was held in administrative segregation before he was transferred to Donaldson Correctional Facility.

### E.  First Amendment Claims

### 1.  Retaliation

In his complaint, Driskell conjectures that, although he admittedly really has "no idea," his confinement in administrative segregation was "*either* retaliation for my filing this [lawsuit] . . . *or* for having been caught with escape plans." (Doc. 6 p. 9; Doc. 29 p. 12) (emphasis added). The Defendants readily admit that, as a result of Driskell's possession of escape plans, he was deemed a risk to the security of the prison and, therefore, was

19

administratively confined to segregation.  (Doc. 42-1 p. 2).  It is, therefore, undisputed between the parties, and the evidence before the court is uncontradicted (Doc. 42-1 p. 2), that Driskell's continued administrative segregation was a consequence of Driskell having in his possession a map and escape plans, and not because he filed this lawsuit.

"The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech. The penalty need not rise to the level of a separate constitutional violation." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989).  However, in prison, First Amendment rights are not absolute.  "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

Possession of an escape plan illustrated by a crudely-drawn map of the prison is wholly inconsistent with both Driskell's status as a prisoner and the legitimate penological objectives of the corrections system.  Accordingly, as a prisoner, Driskell does not retain any First Amendment free speech right to write, illustrate, or possess escape plans, however creative they may be,[3] within the walls of the prison.  *See Procunier v. Martinez* 416 U.S. 396, 412 (1974), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989) (recognizing that a prisoner's escape plan is a "most obvious example" of material that is

_____

[3]Included in Driskell's escape plan, for example, was the following: "have to get pepper and cayenne - mix together either spread on ground or rub on bottom soles of shoes often."  (Doc. 42-1) (sic).  It is not clear why Driskell thought that his escape would be speedier or his trail less difficult to follow if he carried substantial volumes of mixed pepper with him, stopping often to apply it to his feet or disperse it in his wake. However, even if such obviously-superfluous flourishes were included in the escape plan solely for artistic effect, and not for any conceivable purpose of furthering the escape, the court cannot seriously consider them to be an exercise of a First Amendment right.

fundamentally contrary to the legitimate penalogical objectives of preserving discipline and maintaining institutional security against escape).

Therefore, as a matter of law, the decision to place Driskell in administrative segregation as proximate result of his possession of a map and escape plan was not an unconstitutional act of retaliation for the exercise of a constitutionally-protected right. *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) (holding that, to prevail on a retaliation claim, an inmate must establish that the speech that allegedly provoked retaliation was constitutionally protected).  This claim is due to be dismissed.

## 2.    Restriction on Books and Reading Materials

Driskell alleges all prisoners in administrative segregation, including himself, were subject to a prison policy pursuant to which administrative segregation prisoners were not allowed access to newspapers and paperback books.  (Doc. 6 p. 6).  The court construes this claim as one for unconstitutional deprivation of rights secured by the First Amendment to the United States Constitution.  *See  Spellman v. Hopper*, 95 F.Supp. 2d 1267 (M.D. Ala. 1999) (holding that an absolute prohibition on subscription magazines and newspapers as applied to administrative segregation inmates was not reasonably related to legitimate penological goals); *see also Beard v. Banks*, 548 U.S. 521, 531 (2006) (prisoners' First Amendment claim was precluded where the Defendants offered reasonably legitimate penalogical reason[4] for the proscription on access to newspapers and magazines (but allowance of two library books)

---

[4]In this case, the Defendants have not offered any justification for the alleged absolute proscription on all books and newspapers in the administrative segregation unit.

21

for prisoners assigned to segregation unit for, among other infractions, posing a security threat, attempting escape, and possessing implements of escape).

However, Driskell does not allege that he requested and was denied access to newspapers and paperback books by any of the individual Defendants, or that any incident occurred in which any of the Defendants in their individual capacities personally enforced this policy against him.  (Doc. 6 p.6).  Rather, Driskell simply alleges that he, like all other administrative segregation prisoners, was housed in a unit subject to a policy prohibiting prisoners from ordering or receiving books or newspapers.  (Doc. 6 p. 6). Accordingly, the court concludes that Driskell's claim regarding access to printed materials is directed at the policy itself and at Defendants Jones and Nettles in their official capacities (*see* Doc. 6 p. 12), and not at any of the Defendants in their individual capacities.

Therefore, Driskell's demand for monetary damages is precluded with respect to this claim because claims for monetary damages against the Defendants in their official capacities are barred by the Eleventh Amendment, and he does not seek monetary relief from the Defendants in their individual capacities.  *See Lancaster v. Monroe County, Ala.*,  116 F.3d 1419, 1429 (11th Cir. 1997) ("Alabama state officials are immune from claims brought against them in their official capacities.").

Further, as explained in section IV.B. of this Recommendation, because Driskell has been transferred to Donaldson Correctional Facility and no longer resides in the Bullock Correctional Facility administrative segregation unit, his claim for injunctive relief with

22

respect to any policy prohibiting reading material in the Bullock Correctional Facility segregation unit is moot. *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred.").

### F.   Law Library Access

Driskell alleges that, as a prisoner in the segregation unit, he was denied effective access to the courts because he received no ink pen and only one sharpened pencil per week; he did not have access to a pencil sharpener; he received only twelve sheets of typing paper per week; he was able to access only two law library books per week through a book request system; and the inmate serving as a law clerk was unhelpful.  (Doc. 6 pp. 5-6).

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977).  However, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds*, 430 U.S. at 825).  To establish that lack of access to law libraries or legal assistance constitutes an unconstitutional impediment to meaningful access to courts, an inmate cannot simply show that his prison's law library or legal assistance program is "subpar in some theoretical sense."

23

*Id*. Rather, the inmate must establish that the lack of access to legal research resources "caused an actual harm, or in other words, unconstitutionally prevented him from exercising that fundamental right of access to the courts in order to attack his sentence or to challenge the conditions of his confinement." *Akins v. United States*, 204 F.3d 1086, 1090 (11th Cir. 2000) (citing *Lewis*, 518 U.S. at 355). In other words, prisoners do not enjoy "an abstract, freestanding right to a law library or legal assistance." *Lewis*, 518 U.S. at 351. "'[M]eaningful access to the courts is the touchstone.'" *Id*. (quoting *Bounds*, 430 U.S. at 823).

At no point has Driskell identified how any of the alleged limitations on paper, writing implements, and law books, or the inmate law clerk's unhelpfulness, have deprived him of his ability to access the courts. The record in this case (which reflects that Driskell has been able to cite pertinent legal authority, file an amended complaint with numerous claims, file a seventy-four page response to the Defendants' special report (including exhibits) (Doc. 29), and file a thirty-page response to the Defendants' supplemental special report (Doc. 48) (including exhibits) as well as other documents and motions) contains no indication that Driskell has been meaningfully prevented from presenting his claims due to a lack of adequate writing supplies, limited access to the law library, or the prison law clerk's disinclination to be helpful.

Accordingly, Driskell has no standing to present a claim that he has been denied his constitutional right of access to the courts. *Lewis*, 518 U.S. at 351.

## G.   PROPERTY DEPRIVATION

Driskell contends that, on June 21, 2011, when he was transferred to the segregation unit at Bullock Correctional Facility, his personal possessions were confiscated.  (Doc. 6 p. 10).  He was then informed that certain of his personal possessions, consisting of a briefcase and some "pictures," would be destroyed within thirty days if he did not mail them out of the prison.  (Doc. 6 p. 10).  He was unable to mail the materials out of the prison during the required time period because he lacked sufficient funds to cover postage.  (Doc. 6 p. 10).  He alleges that the pictures are irreplaceable.  (Doc. 6 p. 10).

Driskell does not request injunctive relief regarding this claim.  Moreover, it appears that, by the time he filed his initial complaint in this case on July 28, 2011 (Doc. 1-2 p. 1), it was already too late for any prospective injunctive or declaratory relief to spare him the destruction of his property.  Accordingly, no justiciable claim for injunctive or declaratory relief is before the court with respect to the confiscation and destruction of Driskell's personal property.  *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726-27 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (holding that a claim becomes moot "'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"); *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997) ("When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury.").

Although Driskell states that his claim regarding the Bullock Correctional Facility's

unyeilding policy on destruction of excess property is directed at Defendant Jones (Doc. 6 p. 10), Driskell does not allege that any incident occurred in which Defendant Jones (or any of the named Defendants) *personally* enforced this policy against him.  Notably, a letter from Driskell to Defendant Jones dated July 5, 2011, states that, "when my property was finally brought to me in segregation, a lot of my property was missing[,] especially my shower shoes," but the letter does not specifically note the absence of the pictures and briefcase, and it does not inform Defendant Jones about the impending destruction of those items due to Driskell's inability to afford postage to mail those items out of the prison.  (Doc. 29-4). Accordingly, the court concludes that Driskell's claim regarding destruction of excess property is directed at Defendant Jones in his official capacity as Warden of Bullock Correctional Facility, and not at any of the Defendants in their individual capacities. However, in his official capacity, Defendants Jones is absolutely immune from any claims for monetary relief with respect to the destruction of Driskell's personal possessions.  *See Lancaster v. Monroe County, Ala.*,  116 F.3d 1419, 1429 (11th Cir. 1997) ("Alabama state officials are immune from claims brought against them in their official capacities.").

Because any claim for injunctive or declaratory relief is moot and because any claim for monetary relief is barred by absolute immunity, Driskell cannot prevail on his claim for deprivation of property.

## H.   CONDITIONS OF CONFINEMENT

The Eighth Amendment imposes on prison officials the duty to "provide humane

conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).  Driskell alleges that he was subjected to a number of conditions in the segregation unit that violated the Eighth Amendment's prohibition on cruel and unusual punishment.

### 1.   Shower Shoes

Driskell alleges that, on June 21, 2011, his shower shoes were stolen.  He was subsequently denied repeated requests for replacement shower shoes.  (Doc. 6 pp. 6-7). According to Driskell, Defendant Nettles was deliberately indifferent to Driskell's request for shower shoes, stating, "I could care less if you have a pair of shower shoes to wear or not[.] I will not help you get anything." (Doc. 6 p. 7).  Driskell alleges that he went barefoot until the end of July, 2011, when he obtained some shower shoes.  (Doc. 6 pp. 6-7).  During that time, he "had to walk on a bare, dirty concrete floor and shower and walk back to [his] cell on that same bare cold dirty floor [and he] had to request from the infirmary medication for ath[lete's] foot." (Doc. 6 p. 7).   On August 17, 2011, a search of Driskell's cell was ordered to check the validity of his claim that he had no shoes; the searc, confirmed that Driskell had shower shoes at that time. (Doc. 13-1).  It is undisputed that Driskell now has shower shoes. (Doc. 6 p. 7).

Driskell does not allege that he was denied medical care for his athlete's foot.

Accordingly, the court construes Driskell's allegations about his shower shoes as an allegation that the denial of shower shoes violated the Eighth Amendment's prohibition on cruel and unusual punishment in that it constituted deliberate indifference to the risk that Driskell would face discomfort as a result of being without shoes for approximately one month.

"A prison official's 'deliberate indifference' to a *substantial* risk of *serious* harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828 (emphasis added). However, Driskell alleges, at most, that he suffered discomfort when walking on a bare concrete floor; he makes no allegation or suggestion that walking on concrete presented a "substantial risk of serious harm." *Farmer*, 511 U.S. at 828. The Constitution does not mandate that prisons be comfortable, *id.* at 832, and "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004).

Accordingly, the court concludes that any alleged indifference to Driskell's lack of shower shoes during June and July, 2011, did not constitute a violation of the Eighth Amendment. *See Anthony v. Brown*, No. CV 113–058, 2013 WL 3778360, at *3 (slip copy) (S.D. Ga. July 17, 2013) ("Plaintiff here alleges nothing more than minor inconvenience and, reading his reference to walking [barefoot] on concrete liberally, discomfort. Accordingly, Plaintiff's allegations that he was briefly denied his 'T-shoes' . . . fail to rise to the level of an Eighth Amendment violation."); *Cox v. Hartshorn*, 503 F. Supp. 2d 1078, 1086 (C.D. Ill.

28

2007) ("[F]ungal foot rash is not so serious that it is life threatening or poses a risk of needless pain or lingering disability."); *Sanders v. Allen County Jail*, No. 06–CV–302 (RL), 2006 WL 2578977, at *2 (N.D. Ind. Sept. 6, 2006) (holding that exposing a prisoner to the risk of fungal infection posed by a dirty, moldy shower did not pose a substantial risk of serious harm; the Plaintiff "acquired a fungal infection for which he is receiving medical treatment. It is, as he says, 'physical and mentally uncomfortable!' What it is not is a serious harm.").

## 2.   Bedding

For five days per week (Monday through Friday), inmates in disciplinary segregation are required to surrender their mattresses in the morning, and the mattresses are returned in the evening. (Doc. 13-1 p. 3). Thus, while in disciplinary segregation, Driskell was without a mattress for eight to ten hours per day. (Doc. 6 p. 12). Accordingly, he suffered discomfort sleeping and sitting on bare concrete or a metal bunk during those hours, and his discomfort was exacerbated by recent hernia surgery. (Doc. 6 p. 13). Notably, however, Driskell does not allege that the removal of his mattress posed a medical risk or that it violated the orders of a doctor. Thus, at most, Driskell is complaining that he was uncomfortable when he did not have his mattress. The Constitution does not mandate that prisons be comfortable, *Farmer*, 511 U.S. at 832, and "a prisoner's mere discomfort, without more, does not offend the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004).

Accordingly, the court concludes that the daily removal of Driskell's mattress did not

constitute cruel and unusual punishment in violation of the Eighth Amendment.  *Cf. Alfred v. Bryant*, 378 Fed. Appx. 977, 980  (11th Cir. 2010) ("Objectively speaking, sleeping on a steel bed without a mattress for eighteen days, though uncomfortable, is not so extreme as to violate" the Eighth Amendment).

### 3.    Shortage of Toothpaste and Soap

Driskell alleges that supplies such as toothpaste and soap are distributed once every two weeks and that he receives a new tube of toothpaste every thirty days.  (Doc. 6 p. 3).  He alleges that he runs out of these supplies between the regularly-scheduled distributions. (Doc. 6 p. 3).  These conditions of confinement do not present a severe or extreme condition that poses an unreasonable risk of serious damage to Driskell's health and safety, and Driskell has not alleged that he has suffered any harm as a result of the occasional shortage of soap and toothpaste.  *See Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (holding that a prisoner must prove that the prison condition he complains of is sufficiently serious and "extreme" to violate the Eighth Amendment).  Accordingly, the court concludes that the alleged occasional shortage of toothpaste and soap does not rise to the level of an Eighth Amendment violation. *Alfred*, 378 Fed Appx. at 980 ("'Inmates cannot expect the amenities, conveniences and services of a good hotel.'" (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988)).

### 4.    Food Service

Driskell contends that the food service at Bullock Correctional Facility is unsanitary

in that juice is made in a large trash can and then served by an inmate who, while wearing no gloves, bails the juice out of the trash can with a dirty pitcher. (Doc. 6 pp. 3, 5). Driskell does not allege that he personally has been injured by the alleged deficiencies in the food service at Bullock Correctional Facility. Driskell also does not allege that any of the Defendants personally participated in causing the juice to be served in this manner, or that he ever sought and was denied redress for juice service procedures by any of the Defendants. Accordingly, the court concludes that Driskell's claim regarding food service procedures is directed at the Bullock Correctional Facility food service policies in general and at Defendants Jones and McClain in their official capacities (*see* Doc. 6 p. 12), and not at any of the Defendants in their individual capacities. Therefore, Driskell's demand for monetary damages is precluded with respect to this claim because claims for monetary damages against the Defendants in their official capacities are barred by the Eleventh Amendment. *See Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997) ("Alabama state officials are immune from claims brought against them in their official capacities.").

Further, as explained in section IV.B. of this Recommendation, Driskell's claim for injunctive relief from the juice service procedures at Bullock Correctional Facility is moot because he has since been transferred to Donaldson Correctional Facility, and there is no suggestion that he is remotely likely to be transferred back to Bullock Correctional Facility. *See Hathcock*, 287 Fed. Appx. 793 (holding that a prisoner's claims for injunctive relief from allegedly unlawful prison policies were moot when he was transferred from the custody of

31

the prison where those policies were enforced); *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("Absent class certification, an inmate's claim for injunctive and declaratory relief [from adverse prison conditions] in a section 1983 action fails to present a case or controversy once the inmate has been transferred.").

Accordingly, Driskell's Eighth Amendment claim regarding food service procedures is due to be dismissed.

### 5.   Malfunctioning Lighting

In his amended complaint, Driskell complains that, on June 6, 2011, he was moved to cell B-17 in the segregation unit and that, while he was confined there, the main lights in that cell malfunctioned so that they remained constantly on.  (Doc. 6 p. 3).  On September 16, 2011, a maintenance crew attempted to fix the lights, but was unable to do so.  (Doc. 6 pp. 3, 5).  Driskell contracted migraine headaches, allegedly from the constant lighting in the cell, for which he received medical treatment.  (Doc. 6 p. 5).  Driskell alleges that he wrote letters to Defendants Jones and Nettles seeking assistance with the lighting situation in his cell, but those letters went unanswered.  (Doc. 6 p. 5).

On September 24, 2011, Driskell was moved to a different cell in which the lights allegedly did not work properly.  (Doc. 29-20 p. 5).  The lights would either "strobe" on and off or stay on constantly all day and night.  (Doc. 29-20 p. 1).  On October 29, 2011, Driskell complained to an inmate maintenance worker about the lighting in his new cell, and was informed that "it was up to [Defendant] Nettles to fix the lights" in that cell.  (Doc. 29-20 p.

7).  On November 4, 2011, a "free world" electrical crew performed electrical work in the

segregation unit; the crew inspected various cell lights but did not fix them, instead stating

that they would return on a later date to fix the lights in the segregation unit.  (Doc. 29 p. 5).

Meanwhile, on the same day (November 4, 2011), an *inmate* maintenance worker stated to

Driskell that he personally was allegedly under instructions not to fix the lights in two cells,

specifically Driskell's (cell B-6) and cell B-5.  (Doc. 29 p. 14).   On January 13, 2012,

Driskell was moved to a different cell (cell B1-15-A) in the segregation unit.  (Doc. 48 p. 1).

To prevail under § 1983 on his Eighth Amendment claim for malfunctioning cell

lighting, the Driskell must prove three elements: (1) that the constant lighting presented a

condition of confinement that inflicted unnecessary pain or suffering; (2) the Defendants'

"deliberate indifference" to that condition and (3) causation.  *LaMarca v. Turner*, 995 F.2d

1526, 1535 (11th Cir. 1993).  "[I]f an official attempts to remedy a constitutionally deficient

prison condition, but fails in that endeavor, he cannot be deliberately indifferent unless he

knows of, but disregards, an appropriate and sufficient alternative." *Id*. at 1536.  Assuming,

without deciding, that malfunctioning lighting in Driskell's former administrative segregation

cells constitutes a condition of sufficient extreme severity to implicate the Eighth

Amendment, it is nevertheless undisputed that attempts to remedy the condition were

undertaken.  Although attempts to fix the lights were ultimately unsuccessful, Driskell was

eventually moved to another cell.

Accordingly, Driskell cannot prevail on his § 1983 claim regarding malfunctioning

lighting in certain cells in the administrative segregation unit because he cannot demonstrate that the Defendants were deliberately indifferent to any malfunctions in the lighting conditions in those cells, and because he was ultimately moved out of the cells with the defective lighting.  *See LaMarca*, 995 F.2d at 1536 (holding that an official who attempts unsuccessfully to remedy a prison condition cannot be held to be deliberately indifferent to that condition, particularly where he knows of, and implements, and alternative solution to the problem); *see also Farmer v. Brennan*, 511 U.S. 825, 844 (1994) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The Defendants' motion for summary judgment (Doc. 13) be GRANTED.

2.  Judgment be GRANTED in favor of the Defendants.

3.  This case be DISMISSED with prejudice.

4.  Costs be taxed against the plaintiff.

It is further

ORDERED that on or before September 5, 2014, the parties may file objections to this Recommendation.   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised

that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  See also *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 22nd day of August, 2014.

/s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE